IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| GAINESVILLE HOSPITAL DISTRICT § | Case No. 17-40101 | |
| D/B/A NORTH TEXAS MEDICAL § | | |
| CENTER,[1] § | | |
| § | Chapter 9 | |
| DEBTOR. § | | |

**DECLARATION OF RAMIN ROUFEH IN SUPPORT
OF DEBTOR'S CHAPTER 9 PETITION AND OTHER MOTIONS**

1.  My name is Ramin Roufeh.  I am over 21 years of age and am competent to make this declaration under penalty of perjury (the "Declaration").  I am the Chief Executive Officer ("CEO") of Gainesville Hospital District d/b/a North Texas Medical Center (the "Debtor") located in Gainesville, Texas.  I was raised in Richardson, Texas, and attended medical school training at the Texas A&M University Health Science Center.  I completed my family medicine residency and sports/pain fellowship at John Peter Smith Hospital in Fort Worth, Texas.  Immediately after fellowship, I began working at North Texas Medical Center in Gainesville in June 2012.  Prior to being named Chief Executive Officer in June 2015, I served as medical director, Chief Medical Officer, and Chief of Staff of the hospital.  I have enjoyed every moment of working at North Texas Medical Center (the "Hospital") for the last four and a half years.

2.  At the Hospital, we serve a rural population that desperately depends on our Hospital and would have to drive over 30 miles just to access another hospital in Denton or

---

[1] The last four digits of the Debtor's federal tax identification number are: 1664.  The location of the Debtor's principal place of business and the service address for the Debtor is:  1900 Hospital Blvd., Gainesville, TX 76240.

27791993.6                                - 1 -

Denison that would be able to attend to their acute and long term healthcare needs if the Hospital did not exist.

3. The hospital district was created in 1975 and is a political subdivision of the State of Texas. The Hospital currently staffs 48 beds and provides all normally associated inpatient and outpatient services including intensive care, operating rooms. emergency medical services, laboratory, rehabilitation, radiology, obstetrics and gynecology sleep medicine and outpatient clinics. I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances surrounding the commencement of the above-captioned chapter 9 municipal debt adjustment (the "Case") and in support of the Debtor's "First Day Motions" filed with the Court.[2]

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my personal interaction with fellow members of the Debtor's senior management, the Debtor's Board, and other of the Debtor's advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

## OVERVIEW

**A.    Business Overview**

5. Gainesville Hospital District (the "District") was created pursuant to Chapter 211, 64th Legislature, 1975, now codified as Chapter 1077 Texas Special District Local Laws Code, as amended, and owns and operates the Hospital, an acute care hospital in Gainesville, Texas.

---

[2] Any capitalized terms not expressly defined in this Declaration will have the meaning set forth in the relevant First-Day Motion.

27791993.6 - 2 -

6.  The Debtor provides acute medical care, outpatient services, rehabilitation services, a swing-bed program, and clinic services.  The Hospital is licensed for 60 beds and the Debtor has approximately 254 employees.  The Hospital serves as the primary care and acute care center for Gainesville, Texas, Cooke County, and portions of the surrounding counties.  The Hospital is also a designated Trauma Level 4 facility offering 24-hour emergency services.  The Hospital offers a wide range of essential services, including laboratory, medical imaging, cardiology, orthopedics, and rehabilitation.

7.  The Hospital is licensed and subject to strict oversight by the State of Texas Department of Health Services.  As part of their licensing procedure, the Hospital is subject to stringent guidelines, strict oversight, and frequent inspections.  The hospital was inspected as recently as May 2016, and the Hospital passed such inspection and was issued a renewal license to operate.  Additionally, the Hospital is subject to random, unannounced, inspections by Medicare to maintain its Medicare reimbursement accreditation.  The Hospital has never failed a Medicare accreditation inspection.  Moreover, because the Debtor will continue paying its employees and its post-petition vendors and service providers, the Debtor anticipates no loss in staffing and no diminishment in patient care as a result of the Case.

**B.  Events Leading to the Debtor's Restructuring**

8.  Although the Debtor has always been committed to providing the highest level of patient care for the citizens of Cooke County and the surrounding areas, the Debtor has encountered serious financial difficulties to the point where it may not be able to meet payroll and continue operation of the Hospital.  For the last several months, the Debtor has been investigating its options to restructure its obligations in an attempt to avoid closing the Hospital.  The Hospital has determined that it should lease the Hospital to a private operator in order to

begin a process to resolve its financial difficulties and remain in operation since it is the only acute care hospital in Gainesville, Texas. The Debtor has past due expenses that must be paid in order to remain in operation. The Debtor also has obligations that must be funded in order to consummate the lease of the Hospital to the private operator.

9. The Debtor is a municipality and it desires to implement a plan to adjust its debts. Over the days and weeks prior to the filing of the chapter 9 petition, a number of creditors and vendors have put the Hospital on a "COD" basis. Based on my review and analysis of the Debtor's financial records, the Debtor is generally not paying its debts as they become due because it does not have the financial ability to do so. Consequently, the Debtor is insolvent. The Debtor owes unsecured trade debts in excess of $3,100,000, of which more than 70% is 30 days or more past due. Because of the Debtor's critical liquidity issues and due to the number and disparate interests of the general unsecured creditors, the Debtor determined that it was impracticable to attempt to negotiate debt adjustments or reductions with the body of general unsecured creditors.

10. The filing of this Case and the protection of the automatic stay will provide the Debtor with much-needed breathing space and economic stability to negotiate and confirm a plan of adjustment for its past debts and alleged liabilities, which are significant. Through chapter 9, the Debtor intends to focus its efforts and resources on moving forward to make the Hospital financially sound so that it can continue to provide the highest quality patient and medical care for the town and surrounding area.

**SUMMARY OF FIRST-DAY MOTIONS**

11. I have read and reviewed the following First-Day Motions (including the exhibits attached thereto) and the allegations contained in each are true and correct to the best of my knowledge, information, and belief:

      (a)    Emergency Motion for an Order Approving Notice Procedures and Limiting Publication;

      (b)    Emergency Motion For Order Expressly Authorizing Disclosure Of Certain Limited Information Related To Patient Creditors;

      (c)    Emergency Motion to Authorize Debtor to (A) Pay Prepetition Wages and Salaries to Employees and Independent Contractors, (B) Pay Prepetition Benefits and Continue Benefit Programs, and (C) Pay Prepetition Insurance Premiums;

      (d)    Emergency Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payments; and

      (e)    Emergency Motion for Approval of Agreement for Postpetition Secured Credit.

12.    I believe that the relief sought in each of the First-Day Motions (a) is in the best interests of the Debtor, the patients, creditors and other parties in interest; (b) is vital to enable the Debtor to make the transition to, conserve value, and operate in, chapter 9 with minimum disruption to the Hospital's provision of medical care to the residents of Gainesville, Texas, Cooke County, and the surrounding area; and (c) constitute a critical element in achieving the Debtor's successful reorganization and confirmation of a plan of adjustment.

**A.    Emergency Motion for an Order Approving Notice Procedures and Limiting Publication**

13.    There are approximately 4,100 creditors and parties in interest related to this Case. As such, notice of all documents filed in this Case to each creditor and party in interest would be extremely burdensome and costly to the Debtor. I believe it is in the best interests of the Debtor that service of notices and other pleadings listed in the *Expedited Motion for an Order Approving Notice Procedures and Limit Publication* be limited as set forth therein. Such limitations will conserve substantial resources and limit unnecessary service of documents while ensuring that all parties affected by a particular filing receive adequate notice.

14. I believe that providing notice of the commencement of the Case in the Gainesville Daily Register and the Bond Buyer will provide sufficient notice to relevant parties in interest of the Debtor's chapter 9 bankruptcy. The Gainesville Daily Register is a newspaper of general circulation published in the Eastern District of Texas, and the Bond Buyer is a newspaper having a general circulation among bond deals and bondholders, as required under 11 U.S.C. §922.

**B.    Motion For Order Expressly Authorizing Disclosure Of Certain Limited Information Related To Patient Creditors**

15. The Debtor requests express authorization to allow the Debtor to disclose the names, addresses, and amounts owed by the Debtor to certain creditors (if any) who are current or former patients of the Debtor on its creditor list, creditor matrix, and in any subsequent filings listing the identities of creditors. The basis for this First-Day Motion is that listing current or former patient/creditor names on Court filings without express approval from this Court may run afoul of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). I believe that if the Debtor does not disclose any other information other than the name, address, and amount owed by the Debtor, and the Debtor will not identify the creditor as a patient or former patient, the current or former patient/creditors of the Debtor will not be harmed by their being listed on certain Court filings as a creditor of the Debtor.

**C.    Motion to Authorize Debtor to (A) Pay Prepetition Wages and Salaries to Employees and Independent Contractors, (B) Pay Prepetition Benefits and Continue Benefit Programs, and (C) Pay Prepetition Insurance Premiums**

16. The Debtor employs 254 individuals, of whom 21 work on an annual salary basis and 233 individuals work on an hourly basis, and the Debtor also has 5 independent contractors who help run the Hospital's day-to-day operations (collectively, the "Employees"). The Debtor pays all of its Employees on a bi-weekly basis for the current period. The Debtor funded its payroll on or about January 6, 2017, which paid all employees through December 30, 2016. The

employees' next payroll date will be on January 20, 2017, and covers payroll from January 1 through January 14th.

17. In the ordinary course of its business, the Debtor also provides its Employees with certain benefits, including medical, dental and vision insurance, flexible spending accounts, basic and voluntary life and accidental death and dismemberment insurance, a 401(k) retirement savings plan (no match), and paid leave benefits. The Debtor also sponsors several special Employee-funded programs, including a short- and long-term disability benefits program, a supplemental accident/cancer insurance policy, a pre-paid legal services program, and a supplemental general life insurance policy.

18. The Debtor offers vacation to its Employees based upon the length of service and prior experience. The Debtor does allow Employees to "cash out" unused paid time off on any pay date at 75% of its accrued value calculated at the base rate in effect at the time of the cash out. The Debtor seeks to pay its Employees for work performed prepetition, to honor other prepetition employee-related obligations and benefits (the "Employee Obligations"), including severance and termination obligations, and to continue paying its employee obligations in the ordinary course of the Debtor's business. In addition, the Debtor seeks authorization for applicable banks to receive, process, honor, and pay any and all checks, electronic fund transfers, and automatic payroll transfers drawn on the Debtor's payroll and/or general disbursement accounts, to the extent that such checks or transfers relate to any of the prepetition Employee Obligations.

19. The continued operation of the Hospital and its successful reorganization depends largely upon the retention of the services of the Employees and the maintenance of Employee morale and cooperation. Consequently, it is critical that the Debtor be authorized to satisfy its

Employee Obligations and continue their ordinary course Benefit Plans and programs in effect as of the Petition Date. Moreover, if the checks issued and fund transfers requested in payment of the prepetition Employee Obligations are not honored, or if such earned obligations are not timely paid post-petition, the Debtor's Employees could suffer extreme personal hardship and may even be unable, in some instances, to pay their daily living expenses. In addition, it would be inequitable to require the Debtor's Employees to bear personally the cost of any business expenses they incurred prepetition for the benefit of the Debtor with the understanding that they would be reimbursed. The amount of such reimbursement relating to prepetition periods is estimated to be zero.

20. The Debtor, in the ordinary course of business, also accrues state, local and federal employment and withholding taxes relating to wages earned by the Debtor's Employees, which taxes are calculated based upon statutorily mandated percentages of earned wages. The Debtor has historically timely paid all employment and withholding taxes to the relevant taxing authority by check or automated transfer as required, which is usually on a monthly or quarterly basis, or immediately prior to, on or within a specified number of days of, each payroll date. I estimate the total amount of prepetition Employee Obligations, including applicable payroll taxes and the prepetition amounts that will be paid to the Debtor's physicians, to be $625,000.

21. I believe that the authority to pay all Employees Obligations and amounts due under Insurance Policies, including employment and withholding taxes, in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and will enable the Debtor to continue to operate the Hospital in chapter 9 without disruption and to prevent immediate and irreparable harm to the Debtor.

**D.    Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payments**

22.    In the ordinary course of operating its hospital, the Debtor incurs utility expenses for water, electricity, natural gas, telephone service, waste management and other services. Approximately 6 utility providers (collectively, the "Utility Providers") provide these services to the Debtor. I believe that uninterrupted utility services are essential to the Debtor's ongoing operations and to the success of the Case. Should any Utility Provider refuse or discontinue service, even for a brief period, the Hospital's operations could be disrupted, and such disruption would jeopardize the Debtor's reorganization efforts and the safety of its patients. Thus, I believe it is essential that the utility services continue uninterrupted during the Case.

23.    In order to ensure uninterrupted service from the Utility Providers, it is crucial that the Debtor have ample time to negotiate a mutually agreeable form of adequate assurance with the Utility Providers required under Bankruptcy Code § 366. I believe that granting an extension beyond the 20-day limit imposed by statute for the Debtor to provide adequate assurance to the Utility Providers and prohibiting the Utility Providers from commencing or continuing action against the Debtor will not prejudice any party in interest, including the Utility Providers involved.

**E.    Emergency Motion for Approval of Agreement for Post-petition Secured Credit.**

24.    The Debtor requests that the Court enter an order (a) approving an agreement for post-petition financing between the Debtor and Universal Health Services, Inc. (the "Lender") authorizing the Debtor to obtain post-petition credit from the Lender in a maximum amount equal to Seventy-Five Percent (75%) of the sum of (1) the Debtor's outstanding accounts receivable that are less than 91 days old as of the date of determination and (2) the Debtor's tax revenue due from Cooke County, Texas that is available for hospital operations as of the date of determination, on an interim and final basis, cumulative of any amounts advanced on an interim

basis (the "DIP Loan"); (b) granting first-priority and junior liens; and (c) scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") to consider entry of the Final Order on the Motion.

25.     The Debtor does not have sufficient available sources of working capital or cash to continue the operation of its hospital without access to the DIP Loan.  The ability to obtain sufficient working capital and liquidity through the DIP Loan is vital to the preservation and maximization of the value of the Debtor's assets and to successfully adjust the Debtor's debts.

26.     The Debtor's ability to borrow under the DIP Loan is necessary to avoid immediate and irreparable harm to the Debtor.  I believe that the DIP Loan requested is in the best interests of the Debtor, its patients, creditors, and other parties in interest.  The proposed post-petition financing will fund the necessary expenses of the Hospital's operation in the ordinary course, restructuring costs, and other essential costs as the Debtor moves toward the formulation and confirmation of a plan of adjustment.  I believe that the DIP Loan is absolutely crucial for the Debtor to maintain normal operations in the first days of the Case.

## CONCLUSION

27.     The Debtor's ultimate goal is to restructure its obligations under a confirmed plan of adjustment.  In the near term, however, to minimize any loss of value of their hospital during the restructuring, the Debtor's immediate objective is to maintain a business-as-usual atmosphere during the pendency of the Case, with as little interruption or disruption to the Debtor's operations as possible.  I believe that if the Court grants the relief requested in each of the First-Day Motions, the prospect for achieving these objectives will be substantially enhanced.

28.     I believe that approval of the First-Day Motions is in the best interests of all stakeholders and in the best interests of the Debtors.

29.     I declare under penalty of perjury that the foregoing is true and correct.

**FURTHER AFFIANT SAYETH NAUGHT.**

Signed:  _/s/ Ramin Roufeh_____
  Ramin Roufeh, Chief Executive Officer