

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| GAINESVILLE HOSPITAL DISTRICT | § | Case No. 17-40101 |
| D/B/A NORTH TEXAS MEDICAL | § | |
| CENTER,[1] | § | |
| | § | Chapter 9 |
| DEBTOR. | § | |

## FINAL ORDER GRANTING APPROVAL OF AGREEMENT
## FOR POSTPETITION SECURED CREDIT AND SCHEDULING FINAL HEARING

Having considered the *Debtor's Emergency Motion for Approval of Agreement for Postpetition Secured Credit*, filed January 17, 2017 ("the <u>Motion</u>"), the *Declaration of Ramin Roufeh in Support of Debtor's Chapter 9 Petition and Other Motions*, and the First Day Motions, the Court finds that: (a) jurisdiction over the matters in the Motion is proper pursuant to 28 U.S.C. §§ 1334 and 157; (b) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (c) proper and adequate notice of the Motion has been provided and no further notice is needed; (d) the relief sought in the Motion is in the best interests of the Debtor, its creditors, and all parties-in-interest; and (e) good and sufficient cause exists for granting the relief requested in the Motion. Accordingly, it is hereby found that:

1.      On January 17, 2017 (the "<u>Petition Date</u>"), the Debtor filed a petition for relief under chapter 9 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), thereby commencing the above-captioned Chapter 9 municipal debt adjustment case (the "<u>Case</u>").

2.      The Debtor is unable to obtain any unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Court finds that no source

---

[1] The last four digits of the Debtor's federal tax identification number are: 1664. The location of the Debtor's principal place of business and the service address for the Debtor is: 1900 Hospital Blvd., Gainesville, TX 76240.

of credit for the Debtor other than that provided by the DIP Loan (as defined below) exists at this time.  The extension of credit as provided under the terms and conditions in this Order is necessary to preserve the Debtor's operations in the provision of medical care to residents of Cooke County and neighboring areas and will avoid immediate and irreparable harm to the Debtor.

3.     The relief requested in the Motion is necessary, essential, and appropriate for the continued operation of the Debtor's business.

4.     Universal Health Services ("UHS") has agreed to lend a maximum amount up to $3,200,000.00 on a final basis, which falls within the following Borrowing Base parameters: Seventy-Five Percent (75%) of the sum of (1) the Debtor's accounts receivable that are less than 91 days old at the date of determination and (2) the Debtor's tax revenue due from Cooke County, Texas that is available for hospital operations as of the date of determination, on an interim and final basis (inclusive of amounts advanced on an interim basis), to the Debtors (the "DIP Loan") secured by the DIP Collateral (as defined in the Motion) pursuant to a Debtor-in-Possession Loan and Security Agreement ("DIP Loan Agreement").   A true and correct copy of the DIP Loan Agreement is attached hereto as **Exhibit 1** and incorporated herein by reference.

5.     Allowing the Debtor to enter into the DIP Loan with UHS is in the best interest of the Debtor, the creditors, and the parties-in-interest.  The DIP Loan is necessary for the Debtor to have access to sufficient funds to conduct its medical care operations in the ordinary course during the Case.

6.     The terms and conditions of the DIP Loan are fair and reasonable and are believed by the Debtor to be the best available under the circumstance.

7.      The terms of this Order were negotiated in good faith and at arm's length between the Debtor and UHS.

8.      Good cause has been shown for the entry of this Order and authorization for the Debtor to obtain credit from UHS pursuant to the DIP Loan Agreement.  The Debtor's need for financing of the type afforded by the DIP Loan Agreement is immediate and critical.  The terms of the financing authorized hereby appear fair and reasonable, reflect the Debtor's exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

Therefore, it is hereby ORDERED:

9.      Subject to the other terms and conditions of this order, the DIP Loan Agreement is hereby approved on a final basis, as follows:

a.      **Facility Amount**:  A maximum amount equal to Seventy-Five Percent (75%) of the sum of (1) the Borrower's accounts receivable that are less than 91 days old as of the date of determination and (2) the Borrower's tax revenue due from Cooke County, Texas that is available for hospital operations as of the date of determination.

b.      **Purpose**:  The Debtor will use the borrowings under the DIP Loan to: (i) fund the Debtor's operations until the Lender leases the Hospital and begins operations of the Hospital, all in accordance with the terms and conditions of the DIP Loan Agreement and consistent with the initial estimated budget attached as **Exhibit 2** and subsequent budgets as agreed between the parties (the "Budget"); and (ii) pay fees and expenses related to this transaction and the Case.  Expenses to be funded by the borrowings are to be approved by the Lender at the Lender's discretion.

c.      **Term**:  The date of repayment of all sums borrowed by the Debtor under the DIP Loan Agreement will be the effective date of the Hospital's plan of adjustment or dismissal of this Chapter 9 proceeding or the expiration of the Hospital's management agreement, whichever occurs first, but in no event later than the limitations period provided under applicable non bankruptcy law.

d.      **Interest Rate**:  The interest rate on the DIP Loan will be: Twelve Percent (12%).

e.      **DIP Collateral:**  Claims arising under the DIP Facility (the "DIP Claims") shall have priority and shall be secured by liens and collateral as set forth below: (a) pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Claims will be entitled to super-priority administrative expense status in the Chapter 9 case, except with respect to the proceeds of any avoidance actions under Chapter 5 of

the Bankruptcy Code (including, without limitation any actions brought pursuant to Section 926 of the Bankruptcy Code); (b) pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Facility will be secured by a first-priority perfected senior lien on (i) all inventory of Borrower; (ii) all depository accounts of Borrower holding the proceeds of accounts receivable; (iii) to the extent permitted by law, equipment; and (iv) all accounts receivable of Borrower, including tax revenue receivables; *but excluding* (A) any avoidance actions under Chapter 5 of the Bankruptcy Code (including, without limitation any actions brought pursuant to Section 926 of the Bankruptcy Code) or any proceeds of such actions; (B) healthcare receivables to the extent that such receivables cannot be subject to a security interest; and (C) tax revenues levied to pay currently or hereafter outstanding tax bonds of the debtor; (c) pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Facility will be secured by a perfected junior lien on all property and assets of the Borrower that are subject to valid and enforceable prior liens; *but excluding* Borrower's real estate; and (d) pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Facility will be secured by (i) a first priority perfected senior priming lien on the Borrower's non-real estate assets that is senior to and primes any liens securing any prepetition financing arrangement with the Borrower, and (ii) any liens and/or security interests properly perfected and enforceable as of the date of the filing of the Case.

f.   **Stipulations as to Liens and Security Interests of Lender:** (i) Notwithstanding anything to the contrary herein, the Debtor acknowledges that the security interests and liens of the Lender are valid, perfected, and nonavoidable.  (ii) No liens or security interests granted pursuant to this Motion shall prime prior, perfected, liens of any other parties, subject to any rights of the Debtor to avoid such prior lien.  (iii) For the sake of clarity, nothing provided herein shall be deemed to authorize or grant to Lender liens on or interest in any avoidance actions under Chapter 5 of the Bankruptcy Code (including, without limitation any actions brought pursuant to Section 926 of the Bankruptcy Code) or any proceeds of such actions.

10.   UHS shall have no obligation or responsibility to monitor the Debtor's use of the DIP Loan and may rely on the Debtor's representations that the DIP Loan is used in accordance with the terms of this Order and the Budget.

11.   The Debtor is hereby authorized and directed to do and perform all acts and to make, execute, and deliver all instruments and documents which UHS may request to evidence the Debtor's obligations and the Liens (defined herein) as provided herein (the "DIP Loan Documents") and the perfection of such Liens.

12.     The Debtor shall provide to counsel for the Official Committee of Unsecured Creditors (the "Committee") copies of all budgets, variance reports, financial statements and any other reports as and when required to be provided to the Lender under the DIP Loan Agreement.

13.     Any material amendment or modification of the DIP Loan Agreement is subject to approval of the Bankruptcy Court.

14.     Any amendments, supplements or modifications to the approved Budget must be consented to in writing by Lender in its sole discretion prior to the implementation thereof and shall not require further notice, hearing, or court order.

15.     This Order shall be effective upon its entry by the Court. The Court hereby expressly retains jurisdiction over all persons and entities to enforce the terms of this Order and to adjudicate any and all disputes in connection therewith.

16.     Preservation of HHSC and DSHS Rights. (a) Notwithstanding any other provision of this Order to the contrary, the Texas Health and Human Services Commission ("HHSC") and the Texas Department of State Health Services ("DSHS") have reserved (and this Order does not impair or enlarge) any rights of HHSC or DSHS to assert, pursuant to a further application to this Court after notice and an opportunity for a hearing thereon, that the collateral of any secured creditor should be surcharged pursuant to 11 U.S.C. § 506(c) for costs associated with closure of the Debtor's facility as contemplated by 11 U.S.C. § 503(b)(8); and (b) notwithstanding anything contained herein to the contrary, nothing in this Order shall affect any rights of recoupment by HHSC or any exercise by HHSC thereof, but the Debtor or any subsequently appointed Trustee shall retain the right to exhaust administrative remedies to contest the dollar amount of any recoupment(s) effectuated.  For the avoidance of doubt, nothing in this Order shall limit, create

or enlarge any recoupment rights of HHSC or any rights or defenses of the Debtor or any other party with respect thereto.

17.     Subject to the terms hereof, nothing herein shall be deemed or construed to waive, limit, or modify the rights of any party to seek additional relief in these cases in accordance with any provision of the Bankruptcy Code or applicable law or the rights of any other party to oppose the same.

18.     Based upon the findings set forth in this Order and in accordance with Section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangements contemplated by this Order, in the event any or all of the provisions of this Order or any other DIP Loan Agreement or related loan documents are hereafter modified, amended, or vacated by a subsequent order of this or any Court, no such modification, amendment, or vacatur shall affect the validity, enforceability, or priority of any Postpetition Lien, or claim authorized or created pursuant to this Order. Notwithstanding any such modification, amendment, or vacatur, any claim granted by the Lender hereunder or under the Loan Agreement or related loan documents arising prior to the effective date of such modification, amendment, or vacation shall be governed in all respects by the original provisions of this Order and the Loan Agreement or related loan documents, and the Lender, as the case may be, shall be entitled to all of the rights, remedies, privileges, and benefits, including the liens and priorities granted herein and therein, with respect to such claim.

19.     Based upon the record presented to the Court, this Order shall constitute findings of fact and conclusions of law and, notwithstanding Bankruptcy Rules 6006(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, shall take effect immediately and be enforceable upon execution hereof.

20.    The Debtor shall serve by U.S. mail and/or by electronic mail a copy of this Order to (i) the Special Service List [Dkt No. 53]; (ii) any other party that has filed a request for notice with this Court; (iii) counsel for UHS;  (iv) counsel for the Committee; and (v) the United States Internal Revenue Service.

IT IS SO ORDERED.

Signed on 2/15/2017

*Brenda T. Rhoades*    SR

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT 1:**

**DIP Loan Agreement**

# DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This Debtor-In-Possession Loan and Security Agreement, dated as of February [__], 2017 (this "**Agreement**"), is executed by and between UHS of Delaware, Inc. ("**Lender**"), having an address at 367 South Gulph Road, King of Prussia, PA 19406, and Gainesville Hospital District, d/b/a North Texas Medical Center ("**Borrower**"), having an address at 1900 Hospital Blvd., Gainesville, TX 76240.

WITNESSETH:

WHEREAS, Borrower filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on January 17, 2017 (the "**Petition Date**") in the United States Bankruptcy Court for the Eastern District of Texas (the "**Bankruptcy Court**");

WHEREAS, Borrower has requested that Lender extend a secured revolving loan facility in an aggregate principal amount of up to $3,200,000 to fund post-petition operating and restructuring expenses incurred by Borrower in connection with the administration and preservation of Borrower's estate in accordance with the Budget (defined below);

WHEREAS, pursuant to the Interim DIP Order (defined below), Lender loaned the sum of $1,103,740.13 to Borrower on an interim basis in accordance with the terms set forth in the Interim DIP Order; and

WHEREAS, Lender is willing to make additional revolving loans available to Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

## Section 1.   *DEFINITIONS*

**1.1**     Definitions.   When used in this Agreement, the capitalized terms set forth below shall have the definitions assigned to such terms below:

"ACH" means automated clearing house.

"Accounts" means all accounts, including, without limitation, all health care receivables, all governmental health care receivables, and health care insurance receivables, and all other forms of obligations owing to Borrower, whether billed or unbilled, arising out of the provision of services or the sale, lease, license, or assignment of goods or other property, including all receivables, and all proceeds of the foregoing.

"Account Debtor" means a Person who is obligated on an Account.

"Advance" means any advance of a Loan by Lender to Borrower under this Agreement.

"Advance Request" means a written request by Borrower for an Advance signed by an Authorized Representative in the form of **Exhibit A**, which may be updated from time to time by Lender.

"Affiliate" of a Person means another Person which, directly or indirectly, controls, is controlled by, or is under common control with, such former Person, including without limitation any subsidiary of Borrower. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other interests, by contract or otherwise.

"Agreement" shall have the meaning provided in the preamble hereto.

"Authorized Representative" means any officer or employee of Borrower designated by Borrower for purposes of giving and receiving notices hereunder, requesting and repaying Loans and otherwise transacting business with Lender hereunder.

"Bankruptcy Case" means *In re Gainesville Hospital District d/b/a North Texas Medical Center,* U.S. Bankruptcy Court, Eastern District of Texas, Case Number 17-40101.

"Bankruptcy Code" means 11 U.S.C. § 101-1532, as applicable to the Bankruptcy Case.

"Bankruptcy Court" shall have the meaning provided in the recitals hereto.

"Base Rate" means a per annum rate of interest of 12.00%.

"Benefit Plan" means a defined benefit plan as defined in Section 3(35) of ERISA (other than a Multiemployer Plan) in respect of which a Person or any Related Company is, or within the immediately preceding six (6) years was, an "employer" as defined in Section 3(5) of ERISA, including such plans as may be established after the date hereof.

"Borrower" shall have the meaning provided in the preamble hereto.

"Borrowing Base" means, as of any date, the amount determined by Borrower equal to 75% of the sum of (a) Borrower's Eligible Accounts, *plus* (b) Borrower's tax revenue due from Cooke County that is available for hospital operations as of the date of determination; provided, that the Borrowing Base shall be deemed to equal $750,000 until entry of the Final DIP Order.

"Borrowing Base Certificate" means a certificate calculating the Borrowing Base in the form attached hereto as **Exhibit B**.

"Budget" means that certain weekly line item budget covering the period of at least 13 calendar weeks following the Petition Date, approved by Lender in its reasonable discretion and as updated from time to time pursuant to Section 9.2(b).

"Business Day" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of Texas or is a day on which banking institutions located in such state are closed.

"Capital Expenditures" means, with respect to any Person, expenditures made and liabilities incurred for the acquisition of assets, whether financed or unfinanced, which are required to be capitalized in accordance with GAAP, including (without limitation) expenditures incurred in connection with any lease that is required to be capitalized in accordance with GAAP.

"Chapter 9 Plan" means a plan of reorganization pursuant to the Bankruptcy Code.

"Closing Date" (or "Closing") means the date (or day) on which each of the conditions set forth in Section 5.1 are satisfied.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means and includes all of Borrower's now owned or hereafter acquired assets, whether tangible or intangible, including without limitation all of Borrower's right, title, and interest in and to each of the following, wherever located and whether now existing or hereafter arising or acquired, including, without limitation, all of the following:

        (a)        all Accounts, including tax revenue receivables;

        (b)        all inventory;

        (c)        to the extent permitted by applicable law, all equipment;

(d)      all Deposit Accounts holding the proceeds of Accounts constituting Collateral; and

(e)      all cash and non-cash proceeds of the foregoing in whatever form;

provided, that Excluded Property shall not constitute Collateral.

"Default" means any of the events specified in Section 11.1 that, with the passage of time or giving of notice or both, would constitute an Event of Default.

"Deposit Account" means any demand, Lockbox, time, savings, passbook, or similar account now or hereafter maintained by or for the benefit of Borrower, with an organization that is engaged in the business of banking (including, without limitation, banks, savings banks, savings and loan associations, credit unions, and trust companies), and all funds and amounts therein, whether or not restricted or designated for a particular purpose, including without limitation, all "deposit accounts" as defined in the UCC.

"DIP Financing Orders" means the Interim DIP Order and the Final DIP Order.

"Dollar" and "$" means freely transferable United States dollars.

"Eligible Accounts" shall mean all Accounts of Borrower other than Accounts (a) which are not subject to a first priority perfected security interest in favor of Lender or (b) which remain unpaid more than 90 days after the date of the original invoice therefor.

"Environmental Laws" means all federal, state, local, and foreign laws now or hereafter in effect relating to pollution or protection of the environment, including laws relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, removal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes, and any and all regulations, notices, or demand letters issued, entered, promulgated, or approved thereunder.

"ERISA" means the Employee Retirement Income Security Act of 1974, as in effect from time to time, and any successor statute, and any rule or regulation issued thereunder.

"Event of Default" means any of the events specified in Section 11.1.

"Excluded Property" shall have the meaning provided in Section 7.1.

"Expenses and Fees" means all reasonable and documented out-of-pocket expenses and fees invoiced by Lender that arise out of or under this Agreement and the Loans including, without limitation, (i) the reasonable fees and expenses of outside counsel in connection with the negotiation, preparation, execution, delivery, amendment, enforcement, and termination of this Agreement and each of the other Loan Documents, (ii) the out-of-pocket costs and expenses incurred in connection with the administration and interpretation of this Agreement and the other Loan Documents, (iii) the costs and expenses of lien searches, and of perfecting Lender's security interest in the Collateral, and (iv) costs and expenses paid or incurred to obtain payment of the Obligations, enforce the security interest of Lender, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of the Loan Documents, or to prosecute or defend any claim in any way arising out of, related to, or connected with, this Agreement or any of the Loan Documents.

"Facility Limit" means $3,200,000.

"Final DIP Order" means an order of the Bankruptcy Court authorizing and approving this Agreement pursuant to Section 364(c) and (d), among others, of the Bankruptcy Code and Bankruptcy Rule 4001 and providing other relief, in form and substance satisfactory to Lender, and, among other things, finding that Lender is extending credit to Borrower in good faith pursuant to Section 364(e) of the Bankruptcy Code and waiving the provisions of Section 506(c) of the Bankruptcy Code, which order shall not have been (a) vacated, reversed, or stayed, or (b) amended or modified, except as otherwise agreed to in writing by Lender.

"<u>Final Order</u>" means an order or judgment in the Bankruptcy Case entered by the clerk of the Bankruptcy Court, which has not been reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or other reargument, or rehearing has expired, and as to which no appeal, petition for certiorari, new trial, re-argument, or rehearing thereof has been sought, or (ii) such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order shall not cause such order to not be a Final Order.

"<u>GAAP</u>" means generally accepted accounting principles and practices consistently applied.

"<u>Health Care Law</u>" means any and all federal, state, and local laws and regulations governing (i) the manufacture, testing, distribution, possession, assembly, repackaging, sale, administration, or dispensing of health care or medical devices, equipment or supplies, products, biologicals, drugs, or goods, or (ii) the rendering, provision, delivery, or supply of health care services, or (iii) the ownership or operation of a health care facility or business, or assets used in connection therewith, or (iv) the billing or submission of claims, or the collection, deposit, control or handling of accounts receivable (including governmental healthcare receivables), the handling of Protected Health Information, and underwriting the cost of, or provision of management or administrative services in connection with any and all of the foregoing, by Borrower and its subsidiaries, including, but not limited to, laws and regulations under HIPAA and the Privacy Rule, and laws and regulations relating to practice of medicine and other health care professions, professional fee splitting, tax-exempt organization and charitable trust law applicable to health care organizations, certificates of need, certificates of operations and authority, fraud and abuse, kickbacks and rebates, false claims, physician self-referral arrangements, fraudulent billing practices, payment under the Medicare and Medicaid programs, and the federal Food, Drug & Cosmetic Act.

"<u>HIPAA</u>" means the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 and any revisions and amendments.

"<u>Indebtedness</u>" means, without duplication, (a) all obligations for Money Borrowed or for the deferred purchase price of property or services or in respect of reimbursement obligations under letters of credit, (b) all obligations represented by bonds, debentures, notes, and accepted drafts that represent extensions of credit, (c) Capital Expenditures, (d) all obligations (including, during the noncancellable term of any lease in the nature of a title retention agreement, all future payment obligations under such lease discounted to their present value in accordance with GAAP) secured by any Lien to which any property or asset owned or held by a Person is subject, whether or not the obligation secured thereby shall have been assumed by such Person, (e) all obligations of other Persons which such Person has guaranteed, including, but not limited to, all obligations of such Person consisting of recourse liability with respect to Accounts sold or otherwise disposed of by such Person, and (f) the Loans.

"<u>Interest Rate</u>" means the Base Rate.

"<u>Interim DIP Order</u>" means that certain Interim Order Granting Approval of Agreement for Postpetition Secured Credit and Schedule Final Hearing entered by the Bankruptcy Court on January [__], 2017 in the Bankruptcy Case.

"<u>Lender</u>" shall have the meaning provided in the preamble hereto.

"<u>Lender's Office</u>" means the office of Lender designated as Lender's address for notices in <u>Section 12.1(b)</u>, or such other office as Lender may designate from time to time.

"<u>Lien</u>" means, with respect to any Person, any security interest, chattel mortgage, charge, mortgage, deed to secure any debt, deed of trust, lien, pledge, conditional sale or other title retention agreement, or other security interest or encumbrance of any kind in respect of any property of such Person or upon the income or profits therefrom.

"<u>Loan</u>" <u>or</u> "<u>Loans</u>" means all loans made to Borrower by Lender pursuant to <u>Section 2.1</u> of this Agreement.

"<u>Loan Documents</u>" means, collectively, this Agreement, each agreement or document now or hereafter executed and delivered by any Person to evidence or secure the Obligations, and each other instrument, agreement, and document now or hereafter executed and delivered in connection with this Agreement or the Loans.

"<u>Material Adverse Change</u>" means any act, omission, event, or undertaking which would, singly or in the aggregate, have a materially adverse effect upon (a) the business, assets, properties, liabilities, condition (financial or otherwise) or results of operations of Borrower, (b) Borrower's prospect of fully and completely paying or performing all of its Obligations to Lender under the Loan Documents, (c) the ability of Borrower or any of its subsidiaries to perform any obligations under this Agreement or any other Loan Document to which it is a party, or (d) the legality, validity, binding effect, enforceability, or admissibility into evidence of any Loan Document or the ability of Lender to enforce any rights or remedies under or in connection with any Loan Document.

"<u>Maximum Rate</u>" means the maximum nonusurious interest rate, if any, that at any time, or from time to time, may be contracted for, taken, reserved, charged, or received on the Loans under the laws which are presently in effect of the United States and the State of Texas applicable to Lender and such indebtedness or, to the extent permitted by law, under such applicable laws of the United States and the State of Texas (or if applicable, the laws of any other state) which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow, but in no event greater than the rate permitted under Texas law.

"<u>Money Borrowed</u>" means Indebtedness (i) that is represented by notes payable, drafts accepted, bonds, debentures, or similar instruments that represent extensions of credit, (ii) upon which interest charges are customarily paid (other than trade Indebtedness), (iii) that was issued or assumed as full or partial payment for property, or (iv) that is evidenced by a guarantee (but only if the obligations guaranteed would otherwise qualify as Money Borrowed).

"<u>Multiemployer Plan</u>" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which Borrower or a Related Company is required to contribute or has contributed within the immediately preceding six (6) years.

"<u>Obligations</u>" shall mean (i) all Loans made by Lender to Borrower pursuant to this Agreement or otherwise, and interest thereon; (ii) all future advances or other value, of whatever class or for whatever purpose, at any time hereafter made or given by Lender to Borrower, whether or not the advances or value are given pursuant to a commitment and whether or not Borrower is indebted to Lender at the time of such advance; (iii) all costs, fees, and expenses payable by Borrower to Lender pursuant to any of the Loan Documents; and (iv) any amounts recouped under the Medicare or Medicaid programs from the Effective Date to the Termination Date to the extent funded directly or indirectly by Lender.

"<u>Operating Account</u>" means the Deposit Account designated by Borrower for the deposit of Advances.

"<u>Owner Distributions</u>" means Borrower's payments to Borrower's shareholders or members for profits, bonuses, and any other payment or distributions to Borrower's shareholders or members.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation or any successor agency.

"<u>Permitted Indebtedness</u>" means the sum of (i) Indebtedness incurred prior to the Petition Date, *plus* (ii) ordinary course business and trade debt incurred in the normal course of Borrower's business none of which shall be past due, *plus* (iii) the Obligations; *and plus* (iv) any and all future bond indebtedness (including tax bond indebtedness) approved by the Bankruptcy Court.

"<u>Permitted Liens</u>" means: (a) all Liens existing on the Petition Date, (b) Liens securing taxes, assessments, and other governmental charges or levies, or the claims of materialmen, mechanics, carriers, warehousemen, or landlords for labor, materials, supplies, or rentals incurred in the ordinary course of business, and (c) Liens in favor of Lender.

"<u>Person</u>" means an individual, corporation, limited liability company, partnership, joint venture, association, trust, or unincorporated organization or a government or any agency or political subdivision thereof.

"Petition Date" shall have the meaning provided in the recitals hereto.

"Privacy Rule" means 45 CFR Part 160 and Part 164, Subparts A and E, which implement certain provisions of HIPAA and any revision, amendments, or updates.

"Protected Health Information" means protected health information subject to the HIPAA Privacy Rule.

"Related Company" means, as to any Person, any (a) corporation which is a member of the same controlled group of corporations (within the meaning of Section 414(b) of the Code) as such Person, (b) partnership or other trade or business (whether or not incorporated) under common control (within the meaning of Section 414(c) of the Code) with such Person, or (c) member of the same affiliated service group (within the meaning of Section 414(m) of the Code) as such Person or any corporation described in clause (a) above or any partnership, trade, or business described in clause (b) above.

"Requirements of Law" means, any and all laws, regulations, codes, or ordinances applicable to any Person, or any Person's assets, including, without limitation, the Securities Act, the Securities Exchange Act, Regulations T, U, and X of the Federal Reserve Board, ERISA, the Fair Labor Standards Act, the Worker Adjustment and Retraining Notification Act, Americans with Disabilities Act of 1990, the Social Security Act, Environmental Laws, Health Care Law, and any certificate of occupancy, zoning ordinance, building, environmental, or land use requirement or permit, or any other environmental, labor, employment, occupational safety, or health law, rule, or regulation.

"Schedule of Accounts" means a schedule of Accounts delivered by Borrower to Lender in a form reasonably acceptable to Lender that shall contain account balance and aging information listed by Account Debtor name and any other information concerning Borrower's Accounts as Lender may reasonably request from time to time.

"Termination Date" means the earliest to occur of: (a) January [__], 2018, the date that is one year after the initial Advance made pursuant to the Interim DIP Order, (b) the termination of the Management Agreement between Borrower and Lender, except in connection with the execution by Borrower of a lease agreement with Lender or its Affiliates, (c) closing of a sale of all or substantially all the assets of the Borrower in the Bankruptcy Case, (d) the effective date of a plan of adjustment of Borrower that has been confirmed pursuant to an order entered by the Bankruptcy Court and (e) a dismissal of the Bankruptcy Case.

"Termination Event" means (a) a "Reportable Event" as defined in Section 4043 of ERISA, but excluding any such event as to which the PBGC has by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of such event, provided however, that a failure to meet the minimum funding standard of Section 412 of the Code and of Section 302 of ERISA shall be a Reportable Event regardless of the issuance of any such waiver of the notice requirement in accordance with either Section 4043(a) of ERISA or Section 412(d) of the Code, (b) the filing of a notice of intent to terminate a Benefit Plan or the treatment of a Benefit Plan amendment as a termination under Section 4041 of ERISA, or (c) the institution of proceedings to terminate a Benefit Plan by the PBGC under Section 4042 of ERISA or the appointment of a trustee to administer any Benefit Plan.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Texas, including, without limitation, any amendments thereto which are effective after the date hereof.

"Unfunded Vested Liabilities" shall mean the amount (if any) by which (i) the actuarial present value of accumulated benefits under a Benefit Plan which are vested exceeds (ii) such Benefit Plan's net assets available for benefits (all as determined in connection with the filing of the Borrower's most recent Annual Report on Form 5500) but only to the extent such excess would, if such Benefit Plan were to terminate as of such date, represent a liability of the Borrower or any ERISA Affiliate to the PBGC under Title IV of ERISA.  In each case the foregoing determination shall be made as of the most recent date prior to the filing of said Annual Report as of which such actuarial present value of accumulated Plan benefits is determined.

"Variance Report" shall mean a variance report showing actual cash receipts and actual expenditures for each line item in the Budget covering each of the immediately preceding four calendar weeks, and comparing the foregoing amounts with the budgeted cash receipts and budgeted expenditures, respectively, set forth in the Budget

for such line item during each such week.  The Variance Report shall include an explanation as to any variance identified in such report in accordance with the foregoing that varies by more than 15% from the budgeted amount.

     **1.2**    <u>UCC Terms</u>.  Terms defined in the UCC (such as, but not limited to, accounts, deposit account, equipment, inventory, and proceeds), as and when used (without being capitalized) in this Agreement, shall have the meanings given to such terms in the UCC.

     **1.3**    <u>Accounting Terms and Determinations</u>.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and all other certificates and reports as to any financial matters required to be furnished to the Lender hereunder shall be prepared in accordance with GAAP applied on a consistent basis.

**Section 2.**    *REVOLVING CREDIT FACILITY*

     **2.1**    <u>Loan</u>.  Subject to the terms and conditions of this Agreement, prior to the Termination Date, Lender will make Advances to Borrower in an amount not to exceed outstanding at any time the lesser of (a) the Facility Limit, and (b) the Borrowing Base then in effect.  Borrower may borrow, repay, and reborrow the principal of the Loan in accordance with the terms of this Agreement.

     **2.2**    <u>Advances under the Loan</u>.  Borrower may request an Advance under the Loan by making an Advance Request.  Advances made available by Lender will be deposited by wire transfer into Borrower's Operating Account.  Advances will be made available by Lender no earlier than the first business day following the day an Advance Request is received by Lender.

     **2.3**    <u>Repayment of the Loan</u>.  Unless accelerated in accordance with the terms hereof, the outstanding principal amount of, and all accrued and unpaid interest on, the Loan, together with all other unpaid Obligations, shall be due and payable, without demand, on the Termination Date.

     **2.4**    <u>Disbursement of Loans</u>.  Borrower hereby irrevocably authorizes Lender to disburse the proceeds of Loans requested, or deemed to be requested, pursuant to this <u>Section 2</u> as follows:  (a) each Advance requested shall be disbursed by the Lender in lawful money of the United States of America in immediately available funds, (b) in the case of the initial Advance, in accordance with the written instructions from Borrower to Lender, and (c) in the case of each subsequent Advance, to a Deposit Account designated in writing by Borrower to Lender.

     **2.5**    <u>Authorized Representatives</u>.  Borrower shall act hereunder through the Authorized Representatives designated from time to time by Borrower, and all notices and requests to be given and received by Borrower, including requests for Loans, shall be given by and directed to such Authorized Representatives.  Lender may rely on the authority or apparent authority of any officer or employee of Borrower whom Lender in good faith believes to be an Authorized Representative unless Borrower expressly notifies Lender that such officer or employee has been terminated or is otherwise no longer an Authorized Representative.

**Section 3.**    *GENERAL LOAN PROVISIONS; FEES AND EXPENSES*

     **3.1**    <u>Interest</u>.

        (a)    <u>Loans</u>.  Borrower shall pay interest on the unpaid principal amount of the Obligations at a rate per annum equal to the Base Rate payable on the Termination Date.

        (b)    <u>Computation of Interest</u>.  Interest shall be computed on the basis of a year of 360 days and the actual number of days elapsed.

     **3.2**    <u>Expenses and Fees</u>.  All Expenses and Fees shall be paid by Borrower on the Termination Date.

     **3.3**    <u>Manner of Payment</u>.

        (a)    <u>Timing</u>.  Each payment by Borrower on account of the principal of or interest on the Loans or of any fee or other amount payable to Lender shall be made not later than 12:00 p.m. (Central Time) on the

applicable due date (or if such day is not a business day, the next succeeding business day, *provided* that interest shall continue to accrue until such payment is made). All payments shall be made to Lender at Lender's Office or by wire transfer to an account designated by Lender in Dollars in immediately available funds, and shall be made without any setoff, counterclaim, or deduction whatsoever.

     **3.4**    Evidence of Indebtedness.

     (a)    Lender shall maintain accounts in which it will record (i) the amount of each Loan extended hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to Lender hereunder, and (iii) the amount of any sum received by Lender hereunder from Borrower.

     (b)    The entries in the accounts maintained pursuant to subsection (a) above shall be *prima facie* evidence of the existence and amounts of the Obligations therein recorded, *provided, however*, that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of Borrower to repay the Obligations in accordance with their terms.

     **3.5**    Application of Payments. Lender may, in its discretion, apply payments as follows:

     (a)    first, to all fees and costs incurred by Lender for which Borrower is responsible to reimburse Lender under this Agreement or any of the Loan Documents;

     (b)    second, to any accrued but unpaid interest on the Loan;

     (c)    third, to the outstanding principal balance due on the Loan; and

     (d)    last, to any other amounts due Lender under this Agreement or any other agreement between Lender and Borrower.

     **3.6**    Maximum Interest. Borrower and Lender intend to strictly comply with any applicable usury laws. Accordingly, in no event shall Borrower be obligated to pay, or Lender have any right or privilege to reserve, receive, or retain, any interest in excess of the Maximum Rate. On each day, if any, that the interest rate charged under this Agreement (the "Stated Rate") exceeds the Maximum Rate, the rate at which interest shall accrue shall automatically be fixed by operation of this sentence at the Maximum Rate for that day, and shall remain fixed at the Maximum Rate for each day thereafter until the total amount of interest accrued equals the total amount of interest which would have accrued if there were no such ceiling rate as is imposed by this sentence but in no event beyond the Termination Date. Thereafter, interest shall accrue at the Stated Rate unless and until the Stated Rate again exceeds the Maximum Rate when the provisions of the immediately preceding sentence shall again automatically operate to limit the interest accrual rate.

**Section 4.**    ***USE OF PROCEEDS***

     **4.1**    Use of Proceeds. Borrower will use the proceeds of the Loans only for the purposes specified in the recitals to this Agreement and in compliance with the Budget (subject to the variance permitted under Section 8.7).

**Section 5.**    ***CONDITIONS PRECEDENT***

     **5.1**    Conditions Precedent. The provisions of this Agreement, including the commitment of Lender to make Advances, shall not be effective until all of the following have been fully performed or satisfied to Lender's satisfaction as determined in its sole discretion:

     (a)    Borrower shall have executed and delivered to Lender this Agreement;

     (b)    Lender shall have received from Borrower the initial Budget, in form and substance reasonably satisfactory to Lender;

(c)    Borrower shall have submitted certificates executed by the Secretary of Borrower certifying (i) the names and signatures of the officers of such Person authorized to execute Loan Documents, (ii) the resolutions duly adopted by the Board of Directors of Borrower authorizing the execution of this Agreement and the other Loan Documents, as appropriate, and (iii) correctness and completeness of the copy of the bylaws, articles or operating agreement;

(d)    Borrower shall have submitted a certificate regarding the due formation, valid existence, and good standing of Borrower in Texas issued by the appropriate governmental authorities and copies of its organizational documents certified by such authorities;

(e)    the Bankruptcy Court shall have issued the Interim DIP Order; and

(f)    no Default or Event of Default shall have occurred.

**5.2**    Conditions to Subsequent Advances.  The obligation of Lender to make any Advance in addition to the initial Advances is subject to the following conditions precedent:

(a)    Borrowing Base Certificate.    Lender shall have timely received from Borrower each Borrowing Base Certificate required to have been delivered pursuant to the terms hereof prior to the date of the requested Advance.

(b)    Representations and Warranties.  The representations and warranties contained in each of the Loan Documents shall be true and correct in all material respects with the same force and effect as though made on and as of such date.

(c)    Defaults and Events of Default.  No Default or Event of Default shall have occurred and be continuing.

(d)    Legal Restriction.  The Advance shall not be prohibited by any law or regulation or any order of any court or governmental agency or authority.

**Section 6.**        ***REPRESENTATIONS AND WARRANTIES OF BORROWER***

**6.1**    Representations and Warranties.  Borrower represents and warrants to Lender as follows:

(a)    Organization; Power; Qualification.  Borrower is duly organized, validly existing, and in good standing under the laws of the State of Texas and is authorized to do business in the State of Texas.

(b)    Authorization; Enforceability.  Borrower has the power and authority to, and is duly authorized to, execute and deliver the Loan Documents to be executed by Borrower.  All of the Loan Documents to which Borrower is a party constitute the legal, valid, and binding obligations of Borrower, enforceable in accordance with their terms, except as limited by bankruptcy, insolvency, or similar laws of general application relating to the enforcement of creditors' rights generally.

(c)    Conflicts.  Neither the execution and delivery of the Loan Documents, nor consummation of any of the transactions therein contemplated nor compliance with the terms and provisions thereof, will contravene any provision of law or any judgment, decree, license, order, or permit applicable to Borrower or will conflict with, or will result in any breach of, any agreement to which Borrower is a party or by which Borrower may be bound or subject, or violate any provision of the organizational documents of Borrower.

(d)    Consents, Governmental Approvals, Etc.  No governmental approval nor any consent or approval of any third Person (other than those which have been obtained prior to the date hereof) is required in connection with the execution, delivery, and performance by Borrower of the Loan Documents.  Borrower is in compliance with all applicable governmental approvals and all applicable laws.

(e)    Title; Liens.  Except for Permitted Liens, all of the owned properties and assets of Borrower are free and clear of all Liens, and Borrower has good and marketable title to such properties and assets.

Each Lien granted, or intended to be granted, to Lender pursuant to the Loan Documents is a valid, enforceable, perfected, first priority Lien and security interest.

(f)    <u>Litigation, Suits, Actions, Etc</u>.  Other than the Bankruptcy Case, no litigation, arbitration, governmental investigation, proceeding, or inquiry is pending or, to the knowledge of Borrower, threatened against Borrower or that could affect any of the Collateral.

(g)    <u>Tax Returns and Payments</u>.  All tax returns required to be filed by Borrower in any jurisdiction have been filed and all taxes (including property taxes) have been paid prior to the time that such taxes could give rise to any lien.

(h)    <u>ERISA</u>.  (i) no Reportable Event (as defined in ERISA) has occurred and is continuing with respect to any Benefit Plan, and (ii) the PBGC has not instituted proceedings to terminate any Benefit Plan. Borrower has satisfied the minimum funding standards under ERISA with respect to its Benefit Plans and is in compliance in all material respects with the presently applicable provisions of ERISA and the Code, and has not incurred any liability to the PBGC or a Benefit Plan under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA.

(i)    <u>Health Care Matters</u>.

(i)    <u>Compliance With Laws</u>.  Without limiting the generality of any other provision of this Agreement, Borrower is in material compliance with all applicable Health Care Laws, except where non-compliance would not reasonably be expected to cause a Material Adverse Change.

(ii)    <u>Audits and Investigations</u>.  Borrower is not currently subject to any federal, state, local governmental or private payor civil or criminal investigations, inquiries or audits involving and/or related to the operation of Borrower's facilities or its compliance with Healthcare Laws, nor to its knowledge, is Borrower currently subject to any federal, state or private payor inquiry, investigation, inspection or audit regarding its activities, including, without limitation, an inquiry or investigation of any Person having "ownership, financial or control interest" in Borrower (as that phrase is defined in 42 C.F.R. §420.201 et seq.) involving compliance with Health Care Laws, in either case except where such inquiry, investigation, inspection or audit is conducted in the normal course of business and is reasonably not expected to result in a finding of material non-compliance.

(iii)    <u>HIPAA</u>.  Borrower has undertaken any reviews, analyses and/or assessments (including any necessary risk assessments) of all areas of its business and operations required by HIPAA and/or that could be materially adversely affected by the failure of Borrower to be in material compliance with HIPAA.

(iv)    <u>Reports</u>.  Borrower has timely filed or caused to be timely filed all cost reports required by any applicable Health Care Law or any material contract to which Borrower is a party with respect to Borrower's business operations or Borrower's facilities.

(v)    <u>Reimbursements</u>.  Borrower has such participation agreements, permits, licenses, certificates and other approvals or authorizations of Governmental Authorities as are necessary under any applicable Health Care Law to receive reimbursement under Medicare and Medicaid.  Borrower has all Medicare and Medicaid billing number(s) and related documentation necessary to submit reimbursement claims to Medicare and/or Medicaid for any healthcare good or service furnished by Borrower in any jurisdiction where Borrower conducts business.  Borrower is not currently subject to suspension, revocation or denial of its Medicare and/or Medicaid certification, billing number(s), or Medicare and/or Medicaid participation agreement(s), or of any other governmental or private third party payor participation agreement.

(vi)    <u>Patient Records</u>.  All of Borrower's patient or resident records are maintained in accordance with any applicable Health Care Law in all material respects.

(vii)   Patient Abuse.   There have been no charges of patient abuse or licensing violations involving Borrower or a facility operated by Borrower that (i) have been determined to be substantiated by any governmental authority within the past twelve (12) months or (ii) are currently pending or threatened, which in either case would reasonably be likely to have or create a Material Adverse Change.

(j)   Defaults.   No Default or Event of Default has occurred and is continuing.

(k)   Borrowing Base Reports.   All Accounts included in any Borrowing Base Certificate constitute Eligible Accounts, except as disclosed in such Borrowing Base Certificate.

## Section 7.    *SECURITY INTEREST AND COLLATERAL COVENANTS*

**7.1**   Security Interest.   To secure the payment and performance of the Obligations, Borrower hereby grants to Lender a security interest and Lien in and upon all of the Collateral.

Notwithstanding anything herein to the contrary, in no event shall the term "Collateral" include, and the security interest granted hereunder shall not attach to: (i) any avoidance actions under Chapter 5 of the Bankruptcy Code (including, without limitation, any actions brought pursuant to Section 926 of the Bankruptcy Code) or any proceeds of such actions; (ii) any interest in any real property of Borrower; (iii) any healthcare receivables to the extent that such receivables cannot be subject to a security interest under applicable law; and (iv) tax revenues levied to pay currently or hereafter outstanding tax bonds of Borrower (collectively, the **"Excluded Property"**).

**7.2**   Collection of Accounts.

(a)   If Borrower receives any monies, checks, notes, drafts, and other payments relating to or constituting proceeds of Accounts, Borrower shall immediately deposit all such items in kind in the appropriate Deposit Account, fully endorsed.   Borrower shall advise each Account Debtor that remits amounts payable on the Accounts or any other Person that remits amounts to Borrower in respect of any of the Collateral by wire transfer or ACH to make such remittances directly to the Deposit Account.

(b)   Borrower shall cause all moneys, checks, notes, drafts, and other payments relating to or constituting proceeds of Accounts, or of any other Collateral, to be forwarded to a Deposit Account for deposit.

(c)   Nothing herein shall be deemed to restrict the rights of the State of Texas or the United States Department of Health & Human Services as to Medicare or Medicaid receivables.

## Section 8.    *AFFIRMATIVE COVENANTS*

So long as this Agreement shall be in effect or any of the Obligations shall be outstanding, Borrower covenants and agrees as follows:

**8.1**   Preservation of Existence.   Borrower shall preserve and maintain its existence.

**8.2**   Compliance with Requirements of Law.   Borrower shall continuously comply with all material Requirements of Law.

**8.3**   Conduct of Business.   Borrower shall engage only in substantially the same businesses conducted by Borrower on the date hereof.

**8.4**   Accounting Methods and Financial Records.   Borrower shall maintain a system of accounting, and keep such books, records and accounts (which shall be true and complete), as may be required or as may be necessary to permit the preparation of financial statements in accordance with GAAP consistently applied.

**8.5**   Use of Proceeds.   Borrower shall use the proceeds of the Loan only in accordance with Section 4.

**8.6**     <u>Hazardous Waste and Substances; Environmental Requirements</u>.  Borrower shall comply with all material occupational health and safety laws and Environmental Laws.

**8.7**     <u>Compliance with Budget</u>.  Borrower shall cause Borrower's total expenditures for the four week period listed in each Variance Report not to exceed 115% of the amount of total expenditures for such four week period as set forth in the Budget; provided, that in determining compliance with this <u>Section 8.7</u>, any amounts listed in the Budget that are unused in any one week may be carried over and used in any subsequent week, on a line item basis.

**8.8**     <u>Insurance</u>.  Borrower shall keep or cause to be kept adequately insured by financially sound and reputable insurers all of its property usually insured by Persons engaged in the same or similar businesses.  Without limiting the foregoing, Borrower shall insure the Collateral of Borrower against loss or damage by fire, theft, burglary, pilferage, loss in transit, business interruption, and such other hazards as usual and customary in Borrower's industry or as Lender may specify in amounts and under policies by insurers acceptable to Lender, and all premiums thereon shall be paid by Borrower and copies of the policies delivered to Lender.

**8.9**     <u>Notice of Certain Matters</u>.  Borrower shall promptly provide to Lender written notice of any of the following:

(a)     the commencement against Borrower of any audit, investigation, judicial or administrative proceeding, or any criminal or civil investigation initiated, claim filed, or disclosure required of Borrower by the Office of Inspector General, the Department of Justice, Center for Medicare and Medicaid Services (CMS) (formerly HCFA), or any other governmental authority, or any claim filed under the False Claims Act or any other Requirement of Law;

(b)     any amendment of any of the organizational documents of Borrower;

(c)     any change in the executive officers of Borrower;

(d)     copies of all material reports and statements that Borrower receives from any governmental authority;

(e)     any event of default by Borrower under any material agreement (other than this Agreement) to which Borrower is a party; and

(f)     the occurrence of any other event which could reasonably be expected to result in a Material Adverse Change.

**8.10**     <u>Bankruptcy Case</u>.  Borrower shall continuously abide by the DIP Financing Orders, timely file all documents required of Borrower in the Bankruptcy Case, and otherwise be in compliance with all orders respecting Borrower in the Bankruptcy Case.

**8.11**     <u>Chapter 9 Plan</u>. Borrower shall not propose any Chapter 9 Plan that does not provide for the payment in full of all the Obligations.

**Section 9.**         *FINANCIAL AND COLLATERAL REPORTING*

So long as this Agreement shall be in effect or any of the Obligations shall be outstanding, Borrower covenants and agrees as follows:

**9.1**     <u>Financial Statements</u>.

(a)     <u>Monthly Financial Statements</u>.  As soon as available, but in any event within twenty-five (25) days after the end of each month, Borrower shall furnish to Lender copies of the unaudited consolidated balance sheet of Borrower and its subsidiaries as of the end of such month and the related unaudited consolidated income statement and statement of cash flow of Borrower and its subsidiaries for such month and for the portion of the fiscal year of Borrower through such month, certified by the Chief Financial Officer of Borrower as presenting fairly

the financial condition and results of operations of Borrower and its subsidiaries as of the date thereof and for the periods ended on such date, subject to normal year-end adjustments. All such financial statements shall be complete and correct in all material respects and shall be prepared in accordance with GAAP (except for the omission of footnotes) applied consistently throughout the periods reflected therein. Further, all such financial statements shall be prepared in good faith and presented in a form acceptable to Lender.

(d)      Bankruptcy Case Financial Documents. Borrower shall provide Lender with a copy of any financial report or financial document filed by Borrower in the Bankruptcy Case contemporaneously with such filing in the Bankruptcy Case.

(e)      Information Required Pursuant to DIP Financing Orders.      Borrower shall comply with the accounting and information requirements set forth in the DIP Financing Orders.

**9.2**      Borrowing Base Certificate; Budget and Other Reports.

(a)      Borrowing Base Certificate. On Friday of each week (or if such Friday is not a Business Day, the following Business Day), Borrower shall furnish to Lender a Borrowing Base Certificate, along with supporting documentation, based on the amounts known as of the close of business on the immediately preceding Thursday.

(b)      Budget. On the first Friday of each month (or if such Friday is not a Business Day, the following Business Day), commencing on the first such date following the date of this Agreement, Borrower shall deliver an updated, "rolling" 13-week cash flow projection for the period commencing from the end of the previous week through and including thirteen weeks thereafter (each, a "Proposed Budget"), which shall reflect the Borrower's good faith projections, reflect reversal of any timing variances set forth in any Variance Report, include a description of changes from the previously approved Proposed Budget and be in form and detail consistent with the initial Budget. Lender shall have two (2) Business Days following receipt of each Proposed Budget to approve or reject such Proposed Budget upon written notice to Borrower; provided, that any portion of a Proposed Budget that relates to periods covered by a previously approved Proposed Budget shall automatically be deemed approved to the extent that no changes have been made to the Proposed Budget for such periods; provided, further, that, for the avoidance of doubt, Borrower and Lender may nonetheless mutually agree to modify line items in a Proposed Budget for weeks that have been previously approved by Lender. Upon receipt of a notice of rejection, Borrower shall, within one (1) Business Day of receipt of such notice, engage in good faith negotiations with Lender in order to develop a Proposed Budget that is acceptable to Lender in its reasonable discretion (such revised Proposed Budget to be submitted within five (5) Business Days of Borrower's receipt of a notice of rejection).

(c)      Variance Report. On the first Friday of each month (or if such Friday is not a Business Day, the following Business Day), commencing on the first such date following the date of this Agreement, Borrower shall deliver deliver to Lender a Variance Report.

(d)      Other Information. Borrower shall furnish to Lender such other additional information as Lender may reasonably from time to time request.

## Section 10.      *NEGATIVE COVENANTS*

So long as this Agreement shall be in effect or any of the Obligations shall be outstanding, Borrower covenants and agrees as follows:

**10.1**      Indebtedness. Borrower shall not, directly or indirectly, create, assume, or otherwise become or remain obligated in respect of, or permit or suffer to exist or to be created, assumed, or incurred or to be outstanding, any Indebtedness, except for Permitted Indebtedness.

**10.2**      Liens. Borrower shall not, directly or indirectly, create, assume, or permit or suffer to exist or to be created or assumed any Lien on any of the property or assets of Borrower, real, personal or mixed, tangible or intangible, except for Permitted Liens.

**10.3**     Loans.  Borrower shall not make any loans or advances to or for the benefit of any officer, director, manager, shareholder, member, or partner of Borrower except advances for routine expense allowances in the ordinary course of business.  Borrower shall not make or suffer to exist any loans or advances to or for the benefit of any Affiliate of Borrower.  Borrower shall not make any payment on any obligation owing to any officer, director, manager, shareholder, member, partner, or Affiliate of Borrower, except payments of salary.

**10.4**     Merger, Consolidation, Sale of Assets, Acquisitions.  Except as authorized by the Bankruptcy Court in a Final Order, Borrower shall not, directly or indirectly, merge or consolidate with any other Person or sell, lease, or transfer or otherwise dispose of any assets to any Person (other than sales of inventory in the ordinary course of business) or acquire all or substantially all of the assets of any Person or the assets constituting the business or a division or operating unit of any Person.

**10.5**     Transactions with Affiliates.  Borrower shall not, directly or indirectly, effect any transaction with any Affiliate on a basis less favorable to Borrower than would be the case if such transaction had been effected with a Person not an Affiliate, *provided* that Borrower shall not enter into any lease with any Affiliate.

**10.6**     Guaranties.  Borrower shall not, directly or indirectly, become or remain liable with respect to any guaranty of any obligation of any other Person.

**10.7**     Benefit Plans.  Borrower shall not, directly or indirectly, permit, or take any action which would cause, the Unfunded Vested Liabilities under all Benefit Plans of Borrower to exceed $0.

**10.8**     Sales and Leasebacks.  Borrower shall not, directly or indirectly, enter into any arrangement with any Person providing for the leasing from such Person of real or personal property which has been or is to be sold or transferred, directly or indirectly, by Borrower to such Person.

**10.9**     USA Patriot Act.  Borrower shall not (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Lender from making any advance or extension of credit to Borrower or from otherwise conducting business with Borrower, or (b) fail to provide documentary and other evidence of Borrower's or its corporate officers' identities as may be requested by Lender at any time to enable Lender to verify Borrower's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. §5318.

**Section 11.**     *DEFAULT*

**11.1**     Events of Default.  Each of the following events shall constitute an Event of Default:

(a)     Borrower fails to pay any of the Obligations when due and payable;

(b)     Borrower fails to timely observe, meet, or perform any term, covenant, obligation, or duty contained in Section 10 this Agreement;

(c)     Default is made in the due observance or performance by Borrower of any of the covenants or agreements contained in this Agreement other than those described in Section 11.1(a) or Section 11(b), and such default continues unremedied for a period of 30 days after notice thereof is given by Lender to Borrower;

(d)     Any representation or warranty contained herein or in any of the other Loan Documents is false or misleading in any material respect when made or deemed made;

(e)     The Final DIP Order has not been entered as of the date that is 30 days after the date the Interim DIP Order was entered;

(f)     Borrower fails to comply with the DIP Financing Orders in any material respect;

(g)     the Bankruptcy Case is dismissed;

(h)     Lender shall cease to have a valid, perfected, and first priority Lien on any of the Collateral, except (i) Permitted Liens, in which Lender will not have first priority; and (ii) as otherwise expressly permitted herein or consented to in writing by Lender; or

(i)     a state or federal regulatory agency shall have revoked any license, permit, certificate or Medicaid or Medicare qualification pertaining to Borrower, the revocation of which could reasonably be expected to have a Material Adverse Change.

**11.2**   <u>Remedies</u>.

(a)     <u>Termination of Facilities</u>.  Upon the occurrence of an Event of Default, Lender may, in its sole and absolute discretion, declare that the commitment of Lender to make Loans hereunder is immediately terminated.

(b)     <u>Other Remedies</u>.  Without limiting the terms of <u>Section 11.2(a)</u> above, if any Event of Default shall have occurred and be continuing, Lender, in its sole and absolute discretion, may, subject to termination of the automatic stay as set forth in subsection (b)(i) below, take actions enumerated in subsections (b)(ii) through (b)(viii) below:

(i)     The automatic stay issued with respect to the Bankruptcy Case may be terminated after 7 Business Days' prior written notice to Borrower, counsel to Borrower, counsel for any Committee, and the United States Trustee; <u>provided</u>, that the automatic stay shall not be terminated if during such 7 Business Days' period (A) Borrower cures such Event of Default or (B) Borrower or any other party in interest, including the Committee, obtains a court order maintaining the stay;

(ii)     collect any Accounts constituting Collateral from any Account Debtor;

(iii)     require Borrower to assemble the Collateral and make it immediately available to Lender;

(iv)     sell all or any part of the Collateral at either a public or private sale or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places as Lender determines is commercially reasonable;

(v)     collect, foreclose, receive, appropriate, set off, and realize upon any and all Collateral;

(vi)     without notice to Borrower (such notice being expressly waived), and without constituting an acceptance of any Collateral in satisfaction of an obligation (within the meaning of the UCC or any successor statute or law of similar effect), set off and apply to the Obligations any and all balances and deposits of Borrower held by Lender, or indebtedness at any time owing to or for the credit or the account of Borrower held by Lender;

(vii)     declare a default on any other contract or agreement between Borrower and Lender; and

(viii)     exercise any or all rights and remedies available under the Loan Documents, at law and/or in equity including, without limitation, the rights and remedies of a secured party under the UCC (whether or not the UCC is applicable).  Borrower agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notice, but notice given in any other reasonable manner or at any other reasonable time shall also constitute reasonable notice.

**11.3**   <u>Application of Proceeds</u>.  All proceeds from each sale of, or other realization upon, all or any part of the Collateral following an Event of Default shall be applied to the payment of the Obligations (with Borrower remaining liable for any deficiency) in a manner consistent with <u>Section 3.5</u>.

**11.4**   Additional Provisions Concerning Rights and Remedies.

      (a)   Time Essence.   Time is of the essence of all of Borrower's obligations under this Agreement.

      (b)   Rights Cumulative.   The rights and remedies of Lender under the Loan Documents shall be cumulative and not exclusive of any rights or remedies which it would otherwise have.  In exercising such rights and remedies, Lender may be selective and no failure or delay by Lender in exercising any right shall operate as a waiver of such right nor shall any single or partial exercise of any power or right preclude its other or further exercise or the exercise of any other power or right.

      (c)   Waiver of Marshaling.   Borrower hereby waives any right to require any marshaling of assets and any similar right.

## Section 12.   *MISCELLANEOUS*

**12.1**   Notices.

      (a)   Method of Communication.   All notices and the communications hereunder shall be in writing.  Notices in writing shall be delivered personally or sent by overnight courier service, first class mail, postage pre-paid, e-mail, or by facsimile transmission, and shall be deemed received, in the case of personal delivery, when delivered, in the case of overnight courier service, on the next business day after delivery to such service, in the case of mailing, on the third day after mailing (or, if such day is a day on which deliveries of mail are not made, on the next succeeding day on which deliveries of mail are made) and, in the case of e-mail or facsimile transmission, upon transmittal.

      (b)   Addresses for Notices.   Notices to any party shall be sent to it at the following addresses, or any other address of which all the other parties are notified in writing.

      If to Borrower:      Gainesville Hospital District d/b/a North Texas Medical Center
      1900 Hospital Blvd.
      Gainesville, TX 76240
      Attention: Melissa Walker
      Facsimile No.: [_____]

      If to Lender:      UHS of Delaware, Inc.
      Attention:  George Brunner
      367 South Gulph Road
      King of Prussia, PA  19406
      Direct Dial: 610.768.3480
      Facsimile: 610.992.4566
      E-mail: george.brunner@uhsinc.com

**12.2**   Setoff.  In addition to any rights now or hereafter granted under applicable law, and not by way of limitation of any such rights, upon and after the occurrence of any Event of Default, Lender is hereby authorized, but only to the extent permitted by Requirements of Law (including without limitation, any Health Care Law governing prohibiting setoff of certain governmental healthcare receivables), at any time or from time to time, without notice to Borrower or to any other Person, any such notice being hereby expressly waived, to setoff and to appropriate and to apply any and all indebtedness at any time held or owing by Lender to or for the credit or the account of Borrower against and on account of the Obligations, irrespective of whether or not (a) Lender shall have made any demand under this Agreement or any of the Loan Documents, or (b) Lender shall have declared any or all of the Obligations to be due and payable as permitted by Section 11.2 and although such Obligations shall be contingent or unmatured.

**12.3**   Venue; Service of Process.   **EACH OF BORROWER AND LENDER HEREBY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF TEXAS, and agrees and consents that service**

of process may be made upon it in any legal proceeding relating to this Agreement, any borrowing hereunder, or any other relationship between Lender and Borrower by any means allowed under state or federal law. **Any legal proceeding arising out of or in any way related to this Agreement, any borrowing hereunder, or any other relationship between Lender and Borrower shall be brought and litigated in the Bankruptcy Court. Borrower and Lender waive and agree not to assert, by way of motion, as a defense or otherwise, that any such proceeding is brought in an inconvenient forum or that the venue thereof is improper. Nothing herein shall limit the right of Lender to bring proceedings against Borrower in the courts of any other jurisdiction in the event that the Bankruptcy Case has been dismissed. Any judicial proceeding by Borrower against the Lender involving, directly or indirectly, any matter in any way arising out of, related to, or in connection with this Agreement shall be brought only in the Bankruptcy Court**. Each party hereto expressly waives personal service of the summons and complaint or other process or papers issued therein and agrees that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to such party at its address referenced in Section 12.1, which service shall be deemed to have been made on the date that receipt is deemed to have occurred for registered or certified mail as provided in Section 12.1.

      **12.4**    Assignment; Participation.  All the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that Borrower may not assign or transfer any of its rights or obligations under this Agreement. Lender may assign to one or more Persons, or sell participations to one or more Persons in, all or a portion of its rights and obligations hereunder and under this Agreement.  Borrower agrees that Lender may provide any information that Lender may have about Borrower or about any matter relating to this Agreement to any of its Affiliates or their successors, or to any one or more purchasers or potential purchasers of any of its rights under this Agreement or any one or more participants or potential participants.

      **12.5**    Amendments.  Any term, covenant, agreement, or condition of this Agreement or any of the other Loan Documents may be amended or waived, and any departure therefrom may be consented to if, but only if, such amendment, waiver, or consent is in writing signed by Lender and, in the case of an amendment, by Borrower, and, in each instance involving a material amendment, waiver, consent or other modification, approved by the Bankruptcy Court.  Unless otherwise specified in such waiver or consent, a waiver or consent given hereunder shall be effective only in the specific instance and for the specific purpose for which given.

      **12.6**    Expenses and Fees Earned when Paid.  Expenses and Fees paid by Borrower shall be earned by Lender when paid or charged to the Loans.

      **12.7**    Indemnification.  To the extent permitted by State law, Borrower shall reimburse Lender and its Affiliates and their officers, employees, directors, shareholders and agents (collectively, the "Indemnified Parties" and individually, an "Indemnified Party") for all Expenses and Fees and shall indemnify and hold the Indemnified Parties harmless from and against all losses suffered by any Indemnified Party, other than losses resulting from an Indemnified Party's negligence, bad faith, willful misconduct or breach of the terms hereof, in connection with (a) the exercise by Lender of any right or remedy granted to it under this Agreement or any of the Loan Documents or at law, (b) any claim, and the prosecution or defense thereof, arising out of this Agreement or any of the Loan Documents, except in the case of a dispute between Borrower and Lender in which Borrower prevails in a final judgment, and (c) the collection or enforcement of the Obligations or any of them.

      **12.8**    All Powers Coupled with Interest.  All powers of attorney and other authorizations granted to Lender and any Persons designated by Lender pursuant to any provisions of this Agreement or any of the Loan Documents shall be deemed coupled with an interest and shall be irrevocable so long as any of the Obligations remain unpaid or unsatisfied or Lender has any obligations to make Advances hereunder.

      **12.9**Severability of Provisions; Requirements of Law.  The parties intend for this Agreement and all of the Loan Documents to comply with all Requirements of Law.  However, in the event any provision of this Agreement or any other Loan Document is prohibited or unenforceable in any jurisdiction, such provision shall as to such jurisdiction be ineffective only to the extent of such prohibition or unenforceability without invalidating the remainder of such provision or the remaining provisions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.  The parties will thereafter remedy or revise such prohibited or unenforceable provision to the extent required to make the affected Loan Document compliant with the

Requirements of Law and effectuate the parties' rights and obligations under this Agreement, provided that in all events, no provision shall conflict with State law.

**12.10** <u>Governing Law</u>.  This Agreement and the promissory notes issued pursuant hereto shall be construed, subject to the Bankruptcy Code, in accordance with and governed by the laws of the State of Texas other than its conflict of laws principles.

**12.11** <u>Jury Waiver</u>.  **TO THE EXTENT PERMITTED BY STATE LAW, BORROWER AND LENDER HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER AND LENDER'S AFFILIATES ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED HEREIN OR IN THE OTHER LOAN DOCUMENTS.**

**12.12** <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and shall be binding upon all parties, their successors and assigns, and all of which taken together shall constitute one and the same agreement.  A facsimile or digital copy of any signed Loan Document, including this Agreement, shall be deemed to be an original thereof.

**12.13** <u>No Oral Agreements</u>.  **THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

[Signature Pages Follow]

**<u>BORROWER:</u>**

**GAINESVILLE HOSPITAL DISTRICT, D/B/A NORTH TEXAS MEDICAL CENTER**


By:_____

Name:_____

Title:_____

**LENDER:**

**UHS OF DELAWARE, INC.**

By:_____

Name: _____

Title: _____

## **EXHIBIT A**

### **Form of Advance Request**

### **Advance Request**

| | |
|---|---|
| **Date of request:** | |
| **Borrower/Company:** | Gainesville Hospital District, d/b/a North Texas Medical Center |
| **Advance requested for:** | |
| **Amount:** | |

The undersigned hereby certifies to UHS of Delaware, Inc. ("UHS") that:

I am the duly elected, qualified and acting Chief Financial Officer of the Company.  All representations and warranties made by Borrower in the Loan Documents are true and correct on and as of the date hereof as if such representations and warranties had been made as of the date hereof (except to the extent that any representation or warranty which by its terms is made as of a specified date shall be true and correct in all material respects only as of such specified date).  No Default or Event of Default has occurred and is continuing.  Borrower has performed and complied with all agreements and conditions required in the Loan Documents to be performed or complied with by it on or prior to the funding of the advance requested hereby.  After UHS makes the advance requested hereby, the aggregate amount of the Loan will not exceed the Facility Limit.  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Loan Documents.

_____
Signature

_____
Name

_____
Title

## **EXHIBIT B**

### **Form of Borrowing Base Certificate**

BORROWING BASE CERTIFICATE

_____ __, 2017

TO:    UHS of Delaware, Inc.
       [_____]
       [_____]
       Attention: _____

Ladies and Gentlemen:

The undersigned is the Chief Financial Officer of GAINESVILLE HOSPITAL DISTRICT, D/B/A NORTH TEXAS MEDICAL CENTER (the "Borrower"), and such officer is authorized to make and deliver this certificate pursuant to that certain Debtor-In-Possession Loan and Security Agreement dated as of February [__], 2017 between the Borrower and UHS OF DELAWARE, INC. (the "Lender") (such Debtor-In-Possession Loan and Security Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, is referred to herein as the "Loan Agreement"). All terms defined in the Loan Agreement shall have the same meaning herein.

Pursuant to the terms and provisions of the Loan Agreement, the undersigned hereby certifies on behalf of the Borrower that the following statements and information are true, complete and correct as of the date hereof:

(a)    The representations and warranties contained in Section 6 of the Loan Agreement and in each of the other Loan Documents are true and correct in all material respects on and as of the date hereof with the same force and effect as if made on and as of such date (except to the extent that any representation or warranty which by its terms is made as of a specified date shall be true and correct in all material respects only as of such specified date).

(b)    No Default or Event of Default has occurred and is continuing.

(c)    The amount of the outstanding Advances does not exceed the Facility Limit.

(d)    The Eligible Accounts referred to below represent the Eligible Accounts that qualify for purposes of determining the Borrowing Base under the Loan Agreement. Borrower represents and warrants that the information and calculations set forth on Exhibit A hereto regarding the Eligible Accounts and the Borrowing Base are true and correct in all material respects.

(e)    Attached hereto as Schedule 1 is a Schedule of Accounts.

***[Signature Page Follows]***

IN WITNESS WHEREOF, the undersigned has duly executed this Borrowing Base Certificate as of the day and year first above written.

BORROWER:

GAINESVILLE HOSPITAL DISTRICT, D/B/A
NORTH TEXAS MEDICAL CENTER

By:_____
Name:_____
Title:  Chief Financial Officer

**EXHIBIT A**
**TO BORROWING BASE CERTIFICATE**

Calculation of Borrowing Base as of _____, 2017

(1)    Total Accounts .............................................................................................. $_____

(2)    Ineligible Accounts

        (i) not subject to perfected first priority security interest
            in favor of Lender ...................................................................... $_____
        (ii) more than 90 days past invoice date............................................ $_____

        Total Ineligible Accounts............................................................... $_____

(3)    Eligible Accounts (line (1) minus line (2)) ................................................. $_____

(4)    Borrower's tax revenue due from Cooke County that is available
        for hospital operations as of the date of determination ................................. $_____

(5)    Borrowing Base (75% of the sum of lines (3) and (4)) ........................................ $_____

(6)    Facility Limit ....................................................................................................... $3,200,000.00

(7)    Lesser of line (5) or line (6) ................................................................................. $_____

(8)    Amount of outstanding Advances......................................................................... $_____

(9)    Available amount (line (7) minus line (8))........................................................... $_____

## **SCHEDULE 1**
## **TO BORROWING BASE CERTIFICATE**

Schedule of Accounts

[*follows this cover page*]

LOAN AND SECURITY AGREEMENT – EXHIBIT B

# **EXHIBIT 2**

## **Budget**

GAINESVILLE HOSPITAL DISTRICT DBA NORTH TEXAS MEDICAL CENTER
13 WEEK PROJECTION
FEB 17 TO MAY 12, 2017

| | Week Ending 2/17/2017 | Week Ending 2/24/2017 | Week Ending 3/3/2017 | Week Ending 3/10/2017 | Week Ending 3/17/2017 | Week Ending 3/24/2017 | Week Ending 3/31/2017 | Week Ending 4/7/2017 | Week Ending 4/14/2017 | Week Ending 4/21/2017 | Week Ending 4/28/2017 | Week Ending 5/5/2017 | Week Ending 5/12/2017 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE:** | | | | | | | | | | | | | | |
| IP REVENUE | 478,561 | 478,561 | 478,561 | 478,561 | 478,561 | 478,561 | 478,561 | 478,561 | 478,561 | 478,561 | 478,561 | 478,561 | 478,561 | 6,221,287 |
| OP REVENUE | 1,349,853 | 1,349,853 | 1,349,853 | 1,349,853 | 1,349,853 | 1,349,853 | 1,349,853 | 1,349,853 | 1,349,853 | 1,349,853 | 1,349,853 | 1,349,853 | 1,349,853 | 17,548,093 |
| **GROSS PATIENT REVENUE** | 1,828,414 | 1,828,414 | 1,828,414 | 1,828,414 | 1,828,414 | 1,828,414 | 1,828,414 | 1,828,414 | 1,828,414 | 1,828,414 | 1,828,414 | 1,828,414 | 1,828,414 | 23,769,380 |
| **DEDUCTIONS FROM REVENUE** | | | | | | | | | | | | | | |
| OTHER DEDUCTIONS | (684) | (684) | (684) | (684) | (684) | (684) | (684) | (684) | (684) | (684) | (684) | (684) | (684) | (8,889) |
| INDIGENT CARE | (10,914) | (10,914) | (10,914) | (10,914) | (10,914) | (10,914) | (10,914) | (10,914) | (10,914) | (10,914) | (10,914) | (10,914) | (10,914) | (141,888) |
| CONTRACTUAL ADJUSTMENTS | (1,239,201) | (1,239,201) | (1,239,201) | (1,239,201) | (1,239,201) | (1,239,201) | (1,239,201) | (1,239,201) | (1,239,201) | (1,239,201) | (1,239,201) | (1,239,201) | (1,239,201) | (16,109,609) |
| PROVISION FOR BAD DEBT | (120,435) | (120,435) | (120,435) | (120,435) | (120,435) | (120,435) | (120,435) | (120,435) | (120,435) | (120,435) | (120,435) | (120,435) | (120,435) | (1,565,651) |
| SUPPLEMENTAL PAYMENTS | | 530,000 | | | | 118,518 | | | | | | | | 648,518 |
| | | | | | | | | | | | | | | - |
| **TOTAL DEDUCTIONS FROM REVENUE** | (1,371,234) | (841,234) | (1,371,234) | (1,371,234) | (1,371,234) | (1,252,716) | (1,371,234) | (1,371,234) | (1,371,234) | (1,371,234) | (1,371,234) | (1,371,234) | (1,371,234) | (17,177,518) |
| | | | | | | | | | | | | | | - |
| **OPERATING REVENUE** | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 74,256 |
| NON OPERATING REVENUE | 40,000 | 40,000 | 40,000 | 40,000 | 30,000 | - | - | - | - | - | - | - | - | 190,000 |
| **TOTAL OTHER REVENUE** | 45,712 | 45,712 | 45,712 | 45,712 | 35,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 5,712 | 264,256 |
| **TOTAL NET REVENUE** | 502,892 | 1,032,892 | 502,892 | 502,892 | 492,892 | 581,410 | 462,892 | 462,892 | 462,892 | 462,892 | 462,892 | 462,892 | 462,892 | 6,856,117 |
| **EXPENSES:** | | | | | | | | | | | | | | |
| SALARIES | 515,888 | | 515,888 | | 515,888 | | 515,888 | | 515,888 | | 515,888 | | 515,888 | 3,611,219 |
| EMPLOYEE BENEFITS | 140,499 | | 140,499 | | 140,499 | | 140,499 | | 140,499 | | 140,499 | | 140,499 | 983,493 |
| SUPPLIES | 67,722 | 67,722 | 67,722 | 67,722 | 67,722 | 67,722 | 67,722 | 67,722 | 67,722 | 67,722 | 67,722 | 67,722 | 67,722 | 880,386 |
| PURCHASED CONTRACTED SVCS | 63,519 | 63,519 | 63,519 | 63,519 | 63,519 | 63,519 | 63,519 | 63,519 | 63,519 | 63,519 | 63,519 | 63,519 | 63,519 | 825,745 |
| PAYMENTS TO PHYSICIANS | 50,624 | 50,624 | 50,624 | 50,624 | 50,624 | 50,624 | 50,624 | 50,624 | 50,624 | 50,624 | 50,624 | 50,624 | 50,624 | 658,112 |
| LEGAL AND PROFESSIONAL | 200,000 | 30,000 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 367,500 |
| MAINTENANCE AND REPAIRS | 29,583 | 29,583 | 29,583 | 29,583 | 29,583 | 29,583 | 29,583 | 29,583 | 29,583 | 29,583 | 29,583 | 29,583 | 29,583 | 384,578 |
| TELEPHONE AND UTILITIES | 14,838 | 14,838 | 14,838 | 14,838 | 14,838 | 14,838 | 14,838 | 14,838 | 14,838 | 14,838 | 14,838 | 14,838 | 14,838 | 192,897 |
| RENTAL EXPENSE | 173,436 | 87,329 | 3,391 | 3,391 | 3,391 | 87,329 | 3,391 | 3,391 | 3,391 | 3,391 | 87,329 | 3,391 | 3,391 | 465,944 |
| INSURANCE | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 20,237 |
| EDUCATION AND TRAINING | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 6,031 |
| TRAVEL | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| OTHER OPERATING | 4,032 | 4,032 | 4,032 | 4,032 | 4,032 | 4,032 | 4,032 | 4,032 | 4,032 | 4,032 | 4,032 | 4,032 | 4,032 | 52,415 |
| **TOTAL OP EXPENSE** | 1,262,162 | 349,668 | 904,617 | 248,230 | 904,617 | 332,168 | 904,617 | 248,230 | 904,617 | 248,230 | 988,555 | 248,230 | 904,617 | 8,448,556 |
| | | | | | | | | | | | | | | - |
| **NET INCOME (LOSS)** | (759,270) | 683,225 | (401,725) | 254,663 | (411,725) | 249,243 | (441,725) | 214,663 | (441,725) | 214,663 | (525,663) | 214,663 | (441,725) | (1,592,438) |

.